# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

The UNITED STATES OF AMERICA,

      Plaintiff,

    v.

FEDERAL RESOURCES
CORPORATION; BLUM REAL
ESTATE TRUST; BENTLEY J.
BLUM personally and in his capacity
as Trustee of the Blum Real Estate
Trust; and CAMP BIRD COLORADO,
INC.,

      Defendants.

FEDERAL RESOURCES
CORPORATION,

      Counter-Claimant,

    v.

The UNITED STATES OF AMERICA,

      Counter-Defendant.

Case No. 2:11-cv-00127-BLW-RCT

**ORDER ON
PENDING MOTIONS**

The history of Idaho is heavily influenced by the discovery and mining of

rich mineral deposits. Though vital to the development and settlement of the

region, mining left behind significant waste. This case concerns who is responsible

for the cleanup.

The United States brought this action against Federal Resources Corporation

(FRC), the Blum Real Estate Trust (Blum Trust), Bentley J. Blum (Blum), and Camp Bird Colorado, Inc. (CBCI). At its core, the United States' Second Amended Complaint, Dkt. 204, seeks recovery of funds incurred by the United States, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), for environmental cleanup efforts at the Conjecture Mine site in Bonner County, Idaho, and at the Minnie Moore Mine site in Blaine County, Idaho. FRC counterclaimed against the Government, alleging that the United States is contributorily liable for its share of response costs as an owner, operator, or arranger. Dkt. 223.

Pending before the Court are several motions, including: (1) the United States' Motion to Allow the Issue of Attorney Costs to be Tried Separately, Dkt. 207; (2) the United States' Motion for Summary Judgment regarding the Minnie Moore Mine Site, Dkt. 214; (3) FRC's Motion for Partial Summary Judgment regarding its defenses and counterclaims, Dkt. 225; (4) the United States' Motion for Summary Judgment on the Counterclaim, Dkt. 234; (5) the United States' Motion for Partial Summary Judgment Regarding the Conjecture Mine Site, Dkt. 235; (6) the United States' Motion for Summary Judgment on the United States' Claims Under Section 3304(A)(2) of the Fair Debt Collection Practices Act; and re: Veil Piercing, Dkt. 240; (7) the United States' Motions to File Under Seal,

Dkts. 242, 280; and (8) FRC's Motion to Strike, Dkt. 260.

The Court has reviewed voluminous briefing from all interested parties, and heard lengthy argument on these motions on May 5, 2014, in Coeur d'Alene, Idaho. This Order is the memorandum decision ruling on all pending motions. In conformance with District of Idaho motions practice, the parties filed lengthy statements of uncontested facts from which the Court summarizes the relevant background for this decision.

## I.    Factual background

FRC, formerly Federal Uranium Corporation, is a Nevada company established around 1955. Dkts. 236, ¶ 1; 273, ¶ 1. It conducted mining operations at two mine sites relevant here: the Minnie Moore site and the Conjecture site. Dkts. 224, ¶ 7; 273, ¶ 7. Because FRC does not contest its liability for the United States' environmental cleanup costs at the Minnie Moore site, this fact section will focus on activities at the Conjecture site. *See* Dkt. 224.

### A.    Overview of the Conjecture site

The Conjecture site is a hardrock mining site, located partially on private land and partially on United States Forest Service (USFS) lands within the boundaries of the Idaho Panhandle National Forest north of Coeur d'Alene. Dkts. 236, ¶ 3; 273, ¶ 3. The USFS land contains a waste pile referred to by the parties

as the North Dump.  Dkts. 236, ¶ 4; 273, ¶ 4.  The private land contains three

additional waste piles referred to as the South Dumps.  *Id*.  There is no physical

barrier or surface feature separating the two areas.  Dkts. 236, ¶ 6; 273, ¶ 6.  A

small stream named Gold Creek flows south to north from the private land to the

USFS land, and then eventually into Lake Pend Oreille.  *Id*.

### B.     The United States' involvement at the Conjecture site

In 1951, the United States, through its Defense Minerals Exploration

Administration (DMEA) program, began subsidizing mining operations for metals

needed for strategic defense purposes.  Dkts. 227, ¶ 2; 259, ¶ 2.  That same year,

the Funnell and Majer Mining Company (F&M) submitted an application to the

DMEA to enter a lead-zinc mining exploration contract at the Conjecture site.  *Id*.

F&M had no prior mining experience.  Dkts. 227, ¶ 1; 259, ¶ 1.  F&M's

application included a proposal to perform exploration work and to build a 50-ton

per day concentrating mill.  Dkt. 232-1, pg. 4.[1]  The parties agree that the DMEA

did not accept F&M's initial proposal, but disagree on how much involvement the

---

[1]  A concentrating mill processes or "concentrates" ore before shipping the
ore to smelters for further mineral extraction.  Dkt. 232-1, pg. 5.  As the parties
explained during oral argument, this processing was achieved at the Conjecture
mill through a "flotation" process.  Crude ore was ground to a fine powder and
combined with water and reagents, which caused the minerals to rise to the surface
of the slurry.  Those minerals were then captured and taken to another mill for
further refining.

DMEA had in reworking the proposal.  It is undisputed, however, that the DMEA

did accept a revised proposal, which called for deeper exploration than F&M had

initially proposed.  Dkts. 227, ¶ 3; 259, ¶ 3.  A Bureau of Mines engineer, H.T.

Reno, reviewed the application for funding, and recommended that the DMEA sign

an exploration contract with F&M.  Dkts. 239, ¶ 24; 275, ¶ 24.  Reno noted that,

although F&M lacked mining experience, the two men running the company were

competent businessmen and had hired a mining engineer who was given "complete

charge of the mine."  *Id.*

The DMEA gave F&M $26,614—50 percent of the project cost—for

exploration activities, and F&M agreed to pay royalties on its net smelter returns

for 10 years or until the DMEA's contribution had been repaid, whichever came

first.  Dkts. 239, ¶ 26; 275, ¶ 26; 239-1, Ex. B.  The DMEA contract explained that

"[t]he work shall be performed by [F&M], under [its] sole direction and control."

Dkt. 239-1, Ex. B.  It also gave the Government "the right to enter and observe and

inspect the work at all reasonable times," and it allowed the Government to

"consult with and advise [F&M] on all phases of the work."  *Id.*

The DMEA exercised its contractual rights provided by those latter

provisions.  It sent mining engineers from the Bureau of Mines and the United

States Geological Survey to inspect the Conjecture site periodically, typically once

or twice a month.  Dkts. 239, ¶ 29; 275, ¶ 29.  In 1953, after F&M had been unsuccessful in locating ore at the Conjecture site, F&M sought assistance from the DMEA.  Dkts. 227, ¶ 5; 259, ¶ 5.  During a February 13, 1953, visit, DMEA personnel determined that F&M's mining crew had dug in the wrong direction.  *Id*.  One of the DMEA agents suggested that the miners dig in a different direction.  *Id*.  The miners did not follow that advice.  *Id*.

F&M requested another inspection two weeks later, having still failed to find a vein of ore.  Dkts. 227, ¶ 6; 259, ¶ 6.  In a memorandum following that inspection, Raymond Robinson, a U.S. Geologist, wrote, "Since the time of the last inspection (February 13) the foreman had been driving too far in the footwall of the ore-bearing structure.  Recently, he was instructed to turn back to the main structure and the ore shoot was found on it."  Dkt. 263-3.  For reasons that will become clear later, the parties dispute who "instructed" the F&M foreman to change course—the DMEA or someone at F&M.

As indicated in its original DMEA proposal, F&M constructed a flotation mill at the Conjecture site to process ore from the Conjecture mine and other local mines.  Dkts. 227, ¶¶ 7–8; 259,¶¶ 7–8.  The parties dispute whether the DMEA encouraged F&M to build the mill.  Either way, contemporaneous documents show that government officials knew the flotation mill produced tailings and that the

tailings were dumped in an on-site tailings pond.  Dkts. 227, ¶ 9; 259, ¶ 9.  The

parties dispute how many tons of tailings F&M disposed of at the Conjecture site,

how the tailings were apportioned between the South Dumps and the North Dump,

and whether the tailings had been removed before the United States' recent cleanup

efforts.

### C.    FRC's involvement at the Conjecture site

FRC (then Federal Uranium Corporation) began conducting mining

exploration activities at the Conjecture site in 1956 when it entered a lease and

operation agreement with Conjecture Mines, Inc., which owned the mine at that

time.  Dkts. 227, ¶ 15; 259, ¶ 15.  FRC deepened the existing inclined shaft (Shaft

No. 1) by 200 feet and sunk a new three-compartment vertical shaft (Shaft No. 2).

Dkts. 236, ¶ 10; 273, ¶ 10.  By the time FRC finished with Shaft No. 2, the shaft

extended 2,000 feet with extensive drifting, drilling, and cross-cutting off of it.  *Id*.

Most of FRC's exploration activities produced waste rock, which is

economically valueless material removed to gain access to ore deposits in the

mine.  Dkts. 236, ¶ 11; 273, ¶ 11.  FRC left waste rock from its work on

Shaft No. 1 somewhere within the South Dumps at the site.  Dkts. 236, ¶ 13; 273,

¶ 13.  It deposited its waste rock from Shaft No. 2 in the North Dump.  *Id*.  Most of

FRC's waste rock from the Conjecture site was left in the North Dump.  Dkts. 227,

¶ 16; 259, ¶ 16.  FRC ended its mining activities at the Conjecture site in 1964.

Dkts. 236, ¶ 14; 273, ¶ 14.

The parties vigorously dispute whether FRC's waste rock at the Conjecture

site contained hazardous substances—or a sufficient concentration of hazardous

substances—to justify the United States' cleanup efforts.

### D.    The United States' cleanup efforts at the Conjecture site

According to the United States, a number of hazardous substances were

released at the Conjecture site, including arsenic, lead, and manganese in waste

rock piles and soil; cadmium, lead, and zinc in Gold Creek's surface water; and

arsenic in Gold Creek's sediment.  Dkt. 236, ¶ 16.  For its part, FRC says that

sampling data shows that metals concentrations in the North Dump—where it

deposited most of its waste rock—did not exceed site cleanup standards.  Dkt. 273,

¶ 16.

But the United States did clean up the site.  Because the Conjecture site

spanned private and USFS land, the U.S. Environmental Protection Agency (EPA)

and USFS coordinated under CERCLA to plan the site cleanup.  Dkts. 236, ¶ 18;

273, ¶ 18.  The United States completed a Site Investigation in June 2002, which

covered the entire Conjecture site.  Dkts. 236, ¶ 20; 273, ¶ 20.  The report

estimated that the North Dump contained 77,570 cubic yards of waste rock.  *Id*.

The Government then hired an outside contractor, Maxim Technologies, to perform an Engineering Evaluation / Cost Analysis (EE/CA) report. Dkts. 236, ¶ 21; 273, ¶ 21. The EE/CA concluded that "[m]ine wastes located on the site present potential human health and environmental impacts to forest users," including "elevated levels of heavy metal contaminants present in the four waste rock dumps." Dkt. 229-2, pg. E-1. The EE/CA analyzed several cleanup alternatives, and recommended cleanup "Alternative 3," which involved removing mine waste material from the South Dumps and constructing a stream corridor through the North Dump. Dkts. 236, ¶ 23; 273, ¶ 23. Alternative 3 called for regrading the North Dump's waste rock, so that its slopes would be less susceptible to erosion by stream water and the elements, but not removing it. *See* Dkt. 229-2, pg. 79.

In its April 27, 2006, Action Memorandum, the USFS determined that a removal action was necessary for the North Dump. Dkt. 229-4. The Action Memorandum called for removal of "approximately 3,000 cubic yards of mine waste, contaminated native material, and contaminated stream sediments[.]" *Id*. "Another approximately 37,000 cubic yards of mine waste would be moved and re-contoured to a stable condition to establish a clean corridor for Gold Creek," and "Gold Greek would be relocated to its approximate pre-mining location and

gradient." *Id*.

The EPA and the USFS entered into a Memorandum of Understanding for the combined performance of a single removal action. The USFS provided funding, and EPA performed the removal action. Dkts. 236, ¶ 30; 273, ¶ 30. The EPA conducted the cleanup from June to September of 2007. Dkts. 236, ¶ 32; 273, ¶ 32.

## II. Legal standards

### A. Summary judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine" issue of material fact arises "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the non-moving party]." *Id*. at 252. In considering a motion for summary judgment, a court may not weigh the evidence or make credibility determinations, and must draw all inferences in the light most favorable to the non-moving party.

*Id.* at 255.  To the extent there are disputes over non-material facts, the Court has considered them in the light most favorable to the opposing party.

### B.    Motions to strike

Affidavits and declarations are acceptable forms in which to present evidence in support of summary judgment.  Fed. R. Civ. P. 56(c)(1)(A).  However, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

### III.    FRC's liability as to the Conjecture site, including FRC's defenses (Dkts. 225, 235)

The United States moves for summary judgment on its CERCLA claim against FRC to recover cleanup costs incurred at the Conjecture site.  Dkt. 235. FRC moves for summary judgment on a number of its defenses, including that (a) the United States failed to comply with the requirements of the National Oil and Hazardous Substances Pollution Contingency Plan (NCP) and (b) the Conjecture Site is subject to divisibility and apportionment.  Dkt. 225.  The Court addresses each of these in turn.

## A.  The United States' prima facie case under CERCLA

CERCLA establishes a procedure to facilitate hazardous waste site cleanups and ensures that whoever undertakes the cleanup can recover those costs from potentially responsible parties.  *See Pritkin v. Dep't of Energy*, 254 F.3d 791, 795 (9th Cir. 2001).  It imposes strict liability for response costs on "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of."  42 U.S.C. § 9607(a).  To establish a prima facie case for cost recovery, the United States must prove: (1) the site is a "facility," (2) a "release" or "threatened release" of a hazardous substance occurred, (3) the Government incurred costs in responding to the release or threatened release, and (4) FRC is within a class of persons liable under CERCLA. *United States v. Chapman*, 146 F.3d 1166, 1169 (9th Cir. 1998).

FRC only disputes one of these elements.  It claims that there is a genuine issue of material fact as to whether it caused a release or threatened release of a hazardous substance at the Conjecture site.  More specifically, FRC says that its waste rock contained metals concentrations below site cleanup levels and never released hazardous materials.

But the record reveals that there is no genuine issue of material fact that FRC's waste rock contained elevated metals concentrations that presented potential

12

human health and environmental impacts. The EE/CA considered three different cleanup guidelines when analyzing metals concentrations at the Conjecture site. Dkt. 229-2, pg. 37. These included the Human Health Guideline, the Probable Effects Level, and the Phytotoxicity Guideline. *Id*. The EE/CA explained that these guidelines "should be balanced with overall objectives for the removal action rather than used as absolute, numeric criteria." *Id*. Of the twenty-four samples taken from the North Dump, all but one exceeded both the Probable Effects Level and the Phytotoxicity Guideline for arsenic, and two surpassed the Human Heath Guideline. Dkt. 229-1, pg. 19–20. As for lead, fourteen of the samples measured higher than the Probable Effects Level, six exceeded the Phytotoxicity Guideline, and two measured above the Human Health Guideline. *Id*.

These contamination levels are not disputed. And while FRC may think these levels are not high enough to require cleanup, the Ninth Circuit has ruled that "CERCLA's definition of hazardous substance has no minimum level requirement." *A & W Smelter & Refiners, Inc. v. Clinton*, 146 F.3d 1107, 1110 (9th Cir. 1998). In *A & W Smelter*, the contaminating party asked the court to read into CERCLA a minimum level of contamination requirement, arguing that trace levels of hazardous substances are present just about everywhere. *Id*. Counsel for FRC made the same point during oral argument. The Ninth Circuit has

sympathized with the argument, but has concluded that it lacks authority "to read into the statute a limitation that Congress did not put there." *Id*. at 1111.

Here we have two metals—lead and arsenic—that are both "hazardous substances" as defined by CERCLA. 42 U.S.C. §§ 9601(14), 9602; 40 C.F.R. § 302.4. And there is undisputed evidence that concentrations of both metals in the soil, sediment, and waste at the North Dump exceeded three recognized guideline levels. *See* Dkts. 229-2, pg. 37; 229-1, pg. 19–20. This is enough to show a release or threatened release of a hazardous substance.

Nonetheless, FRC urges that only three samples actually exceeded "site cleanup levels." It argues that the United States disregarded the Probable Effects Level and Phytotoxicity Guideline, and relied only on the Human Health Guideline when contemplating its removal action.[2] As it correctly points out, only three

---

[2] Even if FRC were correct that the United States relied only on the Human Health Guideline, the fact remains that two samples from the North Dump exceeded the Human Health Guideline for lead, and two samples exceeded it for arsenic. FRC's expert, Joseph J. Niland, P.G., says that these samples are "not representative of the North Dump conditions" and should be disregarded. Dkt. 229, ¶¶ 9–14. One sample was from native soil, another from sediment, and the third from "orange red sandy gravel." *Id*. The Court has not found a case that instructs it to disregard three "hot spot" samples simply because other areas of the North Dump may have contained lower metals concentrations. Moreover, the "orange red sandy gravel" was not as anomalous as FRC contends. The EE/CA observed that "[w]here waste rock containing sulfide minerals has weathered, red-brown to yellow-brown iron oxide staining is present on rock surfaces and in layers exposed in test pits." Dkt. 229-2, pg. 15. "Several potential waste rock 'hot spots'

samples from the North Dump exceeded the Human Health Guideline—one for lead, one for arsenic, and one for both lead and arsenic. *See* Dkts. 229-2, pg. 37; 229-1, pg. 19–20. But it is clear from the North Dump Action Memorandum that the United States considered more than just the Human Health Guideline. In fact, it specifically referenced the Probable Effects Levels, stating that "[s]amples of stream sediments taken in Gold Creek in the area of the Conjecture Mine indicate that Probable Effects Levels (PELs) or the upper threshold level where compounds are likely elevated to toxic levels were exceeded for arsenic, cadmium, and zinc." Dkt. 229-4.

Moreover, the United States considered effects on plant life in the Action Memorandum, even if it did not mention the Phytotoxicity Guideline by name. For example, it described how "[p]ortions of the mine waste are [] void of most mature plant life due primarily to the concentrations of metals in the waste material." *Id*. The United States has demonstrated on this record that there is simply no genuine issue of material fact that FRC's waste rock constituted a release or threatened

---

(identified by red-brown to yellow-brown coloration) were observed at the North Dump." *Id*. These "hot spots" "were evident in the upper two-feet of waste rock exposed along the steeply sloping banks of Gold Creek" and were "occasionally observed on the surface of the ground in the area of the North Dump near Shaft #2." *Id*. On this record, the United States' decision to remove only the top two feet of waste rock in the North Dump was a reasonable cleanup action in response to the sampling results it received from its contractor.

release of a hazardous substance.

**B.     Consistency with the NCP**

Because the United States has established its prima facie case under

CERCLA § 107(a), "the burden then shift[s] to [FRC] to create a genuine issue of

material fact on the question of whether the [United States'] response action was

consistent with the [NCP]." *Chapman*, 146 F.3d at 1170.  The NCP "provide[s]

the organizational structure and procedures for preparing for and responding to . . .

the releases of hazardous substances[.]" 40 C.F.R. § 300.1.  "The NCP is designed

to make the party seeking response costs choose a cost-effective course of action to

protect public health and the environment." *Wash. State Dept. of Transp. v. Wash.

Natural Gas Co.*, 59 F.3d 793, 802 (9th Cir. 1995).  Consistency with the NCP is

presumed when the United States is seeking recovery of response costs.  *Id*. at

799–800.  To prove that a response action was inconsistent with the NCP, FRC

"must prove that the [United States'] response action was arbitrary and capricious."

*Id*. at 802.  The United States' actions will not be considered inconsistent with the

NCP "based on immaterial or insubstantial deviations."  40 C.F.R. § 300.700(c)(4).

**1.     The USFS' alleged failure to consider the 40 C.F.R.
             § 300.415(b)(2) factors for the North Dump removal action**

Section 300.415(b)(2) requires an agency to consider several factors "in

determining the appropriateness of a removal action[.]"  It does not, however,

require a particular outcome. *See* 40 C.F.R. § 300.415(b)(2) ("The following factors shall be *considered* . . . ."). Nonetheless, FRC contends that a proper balancing of the § 300.415(b)(2) factors compels the conclusion that the USFS' decision to remove the top two feet of the North Dump's mine waste was unwarranted.

The USFS expressly considered the pertinent factors in the North Dump Action Memorandum and identified the five factors of the eight that "form[ed] the basis for [its] determination of the threat presented and the appropriate action to be taken[.]" Dkt. 229-4. FRC merely disagrees with the USFS' conclusion after balancing these factors. But for the reasons provided above, FRC has failed to raise a genuine issue of material fact on whether the USFS' removal action in the North Dump was arbitrary and capricious in light of the factors it was obligated to (and did) consider.

### 2. The USFS' decision not to follow the cleanup alternative recommended by the EE/CA

FRC takes issue with the USFS' decision to remove waste material from the North Dump when the EE/CA's preferred alternative only called for regrading the North Dump. This argument misconstrues the purpose of the EE/CA. 40 C.F.R. § 300.415(b)(4)(i) requires the Government to conduct an EE/CA; it does not require the Government to adopt the EE/CA's preferred removal action alternative. The

EE/CA is "an *analysis* of removal alternatives for a site," 40 C.F.R. § 300.415(b)(4)(i), not a binding decision document. Given the sampling data in front of it, as described above, the USFS' decision to remove the top two feet of the North Dump waste rock was neither arbitrary nor capricious.

### 3. The USFS' alleged failure to obtain agency approval of the removal action

FRC argues that USFS management never approved the North Dump Action Memorandum because the signature approval page attached to the North Dump Action Memorandum references the Idaho Lakeview Mine site (a third remediated mine site allegedly operated by FRC and later dropped from this litigation) rather than the Conjecture Mine site. FRC cites no NCP provision violated by this error. In any event, the North Dump Action Memorandum clearly describes the North Dump removal action at the Conjecture site and attaches maps of the North Dump. And it was signed and dated after the Idaho Lakeview Mine site removal action had been completed, removing any doubt that the signature page was mistakenly or fraudulently attached from a different action memorandum. *See* Dkt. 69, ¶ 29. FRC has produced no evidence that the signature-page reference to the Idaho Lakeview Mine site is anything other than a clerical error. It is certainly not sufficient to make even a prima facie showing that the USFS decision to clean up the Conjecutre site was arbitrary and capricious.

18

### 4. The USFS' alleged unwarranted cleanup

FRC believes the North Dump cleanup was unnecessary because the waste rock was below site cleanup levels. FRC cites to no NCP provision to support its claim. Regardless, for the reasons explained in detail above, the Court disagrees with FRC's narrow definition of "site cleanup levels" and finds the factual record indisputable to reach the legal conclusion that there was sufficient evidence of elevated metals concentrations to justify the North Dump removal action.

### 5. The USFS' alleged failure to maintain a complete administrative record

FRC says that the USFS' administrative record is incomplete because it lacks any documentation of compliance with the public notice requirements of 40 C.F.R. § 300.415(n)(4). Under that regulation, the Government is instructed to involve the public in its site-removal decision-making process by, for example, engaging public officials, making the administrative record available to the public, and receiving and responding to public comments. 40 C.F.R. § 300.415(n)(4).

FRC is correct that the NCP requires the lead agency to maintain an administrative record. 40 C.F.R. § 300.800(a). With respect to public outreach:

> The administrative record file for selection of a response action typically, but not in all cases, will contain . . . (3) Documents received, published, or made available to the public . . . . Such documents may include notice of availability of the administrative record file, community relations plan, proposed

19

> plan for remedial action, notices of public comment periods,
> public comments and information received by the lead agency,
> and responses to specific comments.

40 C.F.R. § 300.810(a)(3). The United States does not dispute that its administrative record lacks evidence of public outreach efforts.

To show its compliance with these obligations, however, the United States submitted a declaration from an EPA On-Scene Coordinator, Earl Liverman. Dkt. 236-2. Mr. Liverman explained that the EPA kept the public and local community informed by placing advertisements in local newspapers, distributing written bulletins to persons in local residences, alerting the community to the availability of the administrative record for their review, and advising the public of a website where the EPA displayed information about the work being conducted. *Id.* at ¶ 26.

The fact remains that "[t]he administrative record for the Conjecture Mine site is missing documentation regarding community involvement." Dkt. 227, ¶ 33. Importantly, however, FRC has produced no evidence that the United States failed to conduct community outreach. Indeed, the only record evidence on this point shows that the United States *did* satisfy its public outreach obligations. Dkt. 236-2, ¶ 26. The United States' failure to place evidence of this outreach in the administrative file is, in this Court's view, a procedural error. And "[i]n reviewing alleged procedural errors, the Court may disallow costs or damages only if the

errors were so serious and related to matters of such central relevance to the action that the action would have been significantly changed had such errors not been made." 42 U.S.C. § 9613(j)(4). FRC does not suggest, and has produced no evidence showing, that the Government's inclusion of public outreach documents in its administrative file would have significantly changed the course of the removal action. *See id.*

### 6. The EPA's alleged failure to comply with the NCP at the South Dump

FRC argues that the EPA violated the NCP in connection with its South Dump removal action. First, it says that the EPA failed to complete the removal work within six months, as purportedly required by 40 C.F.R. § 300.415(n)(2). That regulation requires the lead agency to undertake certain public outreach efforts "[f]or CERCLA actions where, based on the site evaluation, the lead agency determines that a removal action is appropriate, and that less than six months exists before on-site removal activity must begin." 40 C.F.R. § 300.415(n)(2). The thrust of the regulation is to promote public outreach efforts. Contrary to FRC's assertion, it does not create an NCP violation when time-critical actions begin after six months.

Second, FRC contends that alleged threats to human health and the environment identified in the EE/CA were different than the alleged threats in the

21

South Dump Action Memorandum.  It says that this inconsistency is an NCP

violation but cites no relevant section of the NCP to support its claim.  In any

event, the human health and environmental risks identified in the EE/CA and the

South Dump Action Memorandum were materially the same.  Both documents

clearly show that elevated metals concentrations posed risks to humans and the

environment.  For example, both the EE/CA and the South Dump Memorandum

explain that arsenic, lead, and manganese posed human health risks at the site.

Dkts. 229-2, pg. 35; 236-2, Exh. B, pg. 6.  And both say that arsenic, lead, and zinc

presented ecological risks to aquatic life.  Dkts. 229-2, pg. 35; 236-2, Exh. B, pg. 8.

FRC has not shown the EPA's action to be arbitrary or capricious.[3]

     Finally, FRC states that the EPA neglected to engage in or allow for public

---

[3] FRC also briefly argues that the EPA failed to follow through on the removal action selected in the South Dump Action Memorandum.  FRC cites only to the declaration of Joseph Niland for this conclusory proposition, without as much as a paragraph number for the Court's reference.  On its own review, the Court discovered Mr. Niland's similarly conclusory statement, in paragraph 43, that "[t]he action described [in the South Dump Action Memorandum] was never implemented."  Dkt. 229, ¶ 43.  Mr. Niland provides no citation to his 55-page expert report.  On its own review of the full report, the Court was unable to locate anything in Mr. Niland's expert report that raises a genuine issue of fact whether the EPA's removal action was arbitrary and capricious.  Judges are not like "pigs sniffing for truffles."  *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1007, n.1 (9th Cir. 2000).  It is incumbent upon the parties to provide specific citation to the record in support of record-based arguments.  *See id.*  The failure to do so may properly result in rejection of the argument.

participation in its removal action. As described above, this is refuted by EPA On-Scene Coordinator Earl Liverman. Dkt. 236-2. FRC has not rebutted the evidence submitted by the United States.

In sum, FRC has failed to carry its burden of creating a genuine issue of material fact on the question whether the United States' response action was consistent with the NCP. *See Chapman*, 146 F.3d at 1170.

## C. Divisibility and apportionment

The parties have cross-moved for summary judgment on FRC's defense seeking to divide and apportion the harm and, in turn, the damages stemming from the Conjecture site. Dkts. 225, 235. CERCLA does not mandate joint and several liability in all cases. But FRC "bear[s] the burden of proving that a reasonable basis for apportionment exists." *Burlington N. & Santa Fe Ry. Co.*, 556 U.S. 599, 614 (2009). When determining whether harm is divisible under CERCLA, the Ninth Circuit looks to "the contamination traceable to each defendant." *United States v. Burlington N. & Santa Fe Ry. Co.*, 520 F.3d 918, 939 (9th Cir. 2008), *overruled on other grounds by Burlington N.*, 556 U.S. 599 (2009).

FRC's defense fails for two fundamental reasons. First, FRC's experts all assumed in their analyses that FRC's waste rock was benign. As explained above, the Court has already rejected that assumption as a matter of law.

Second, even assuming that FRC's experts have reasonably quantified and attributed the quantity of waste at the Conjecture site to specific operators, they have not identified the *contamination* traceable to each operator. *See Burlington N.*, 520 F.3d at 939. Relying merely on the quantity of waste might be an appropriate apportionment method when the hazardous substances within the waste are equally distributed. For example, in *Coeur d'Alene Tribe v. ASARCO, Inc.*, 280 F. Supp. 2d 1094 (D. Idaho 2003), United States District Judge Edward Lodge found that the tailings-related harm to natural resources in that case could be divided based on the volume of tailings generated by various mills. 280 F. Supp. at 1120–21. Central to his holding, however, was that the environmental harm stemmed from the same waste material—tailings—and that the metals composition of the various tailing sources differed only slightly. *Id.* at 1120 ("[T]he milling methodologies . . . did not differ significantly from mill to mill to preclude divisibility based on the volume of tailings generated.").

Not so here. According to FRC, the United States removed both tailings and waste rock. Dkt. 309-1, ¶¶ 2–5. Complicating matters even further, FRC's own experts, Joseph Niland and Chris Pfhal, say that the waste deposited at the Conjecture site varied drastically in metals concentrations—the South Dump contained waste with significantly higher metals concentrations. Dkt. 229, ¶ 71;

24

230, ¶¶ 19–20. FRC has provided no reasonable basis to divide and apportion the harm caused at the Conjecture site that takes into account both the quantity and *degree of contamination* of the waste. The United States is therefore entitled to summary judgment on FRC's defense.

### D.    Damages

Having found that FRC is liable under CERCLA, the United States is entitled to recover "all costs of removal or remedial action incurred by [it] not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(A). The United States asserts that it incurred $3,653,362.52 in unreimbursed costs in removal and remedial action at the Conjecture site, and $54,546.22 in prejudgment interest. Dkts. 236, ¶¶ 34–45; 238-6. It has supported these figures through the declaration of Wiley R. Wright, a Certified Public Accountant and Senior Managing Director with the consulting firm of FTI Consulting, Inc. Dkt. 238-6.

FRC does not dispute the calculation of these figures, but rather contends that the costs are not recoverable "because the [G]overnment's removal action was inconsistent with the NCP, not justified, and not taken to address a release or threat of release of hazardous substance at the [Conjecture] site." Dkt. 273, ¶¶ 34–45. However, the Court has found that the United States' removal action was

consistent with the NCP,[4] adequately justified, and taken to address a release or threat of release of hazardous substances at the Conjecture site.

Accordingly, there is no genuine issue of material fact that the United States incurred the costs it seeks to recover. Judgment and declaratory relief are appropriate as a matter of law. *See* 42 U.S.C. §§ 9607(a)(4)(A); 9613(g)(2).

## IV. FRC's counterclaims against the United States (Dkts. 225, 234)

FRC has moved for summary judgment on its counterclaim attempting to hold the United States contributorily liable as an "arranger" at the Conjecture site. Dkt. 225. The United States has moved for summary judgment on each of FRC's counterclaims, arguing that it cannot be held contributorily liable as an "arranger," "operator," or "owner." Dkt. 234.

### A. Arranger liability

The United States and FRC have cross-moved for summary judgment on FRC's counterclaim alleging that the United States is liable for response costs incurred as an arranger. Dkts. 225, 234. CERCLA imposes liability on "any person who by contract, agreement, or otherwise arranged for disposal or

---

[4] As the Court explains below, the United States has not moved for summary judgment on its enforcement costs. Whether its enforcement costs records are consistent with NCP will be taken up at a later stage in these proceedings.

treatment, or arranged with a transporter for disposal or treatment, of hazardous

substances[.]" 42 U.S.C. §9607(a)(3). A party will be held liable as an arranger

only if it "takes intentional steps to dispose of a hazardous substance." *Burlington*

*N.*, 556 U.S. at 611.

FRC argues that the United States should shoulder its own response costs

because it "arranged" for the disposal of mine waste in connection with its

subsidization of F&M's mining activities in the 1950s. Specifically, FRC contends

that the United States "developed the [F&M] mining plan, directed the digging,

encouraged construction of a mill, knew the mill produced tailings, knew the

tailings were dumped on-site and could have but failed to direct proper disposal of

the tailings to prevent pollution." Dkt. 226, pg. 12.

FRC relies primarily on a decision from this district, which found the United

States liable as an arranger on similar facts. *ASARCO*, 280 F. Supp. 2d at 1134. In

addressing arranger liability based on DMEA exploration contracts, Judge Lodge

explained that the United States "knew or should have known that the exploration

would create mining tailings" and that "[t]he government encouraged generation of

tailings from the exploration," *id.*, presumably by entering the DMEA contract for

mining.

But the Supreme Court has spoken since Judge Lodge's decision, holding

that knowledge of the disposal of hazardous substances is not alone sufficient to establish arranger liability. *Burlington N.*, 556 U.S. at 612. In *Burlington N.*, the Court held that Shell Oil was not an arranger merely because it knew that a purchaser of its chemical products occasionally spilled some of the product. *Id.* at 612–13. Rather, "[i]n order to qualify as an arranger, Shell must have entered into the sale of [the chemical product] with the intention that at least a portion of the product be disposed of during the transfer process[.]" *Id.* at 612.

The Ninth Circuit has since provided further guidance. In *Team Enterprises, LLC v. Western Investment Real Estate Trust*, 647 F.3d 901 (9th Cir. 2011), a dry-cleaning store operator sought contribution under CERCLA against the manufacturer of a product that filtered and recycled water contaminated with perchlorethylene (PCE). The product filtered PCE-laden water, returned the distilled PCE to the dry-cleaning machines, and deposited the resulting wastewater into an open bucket. But some PCE remained in the wastewater, and the dry-cleaning company poured the wastewater down the drain. The dry-cleaning company argued that the manufacturer's product made disposal of PCE inevitable, and that it had no other choice than to pour the waste down the drain. The appellate court disagreed, explaining that, "At most, the design indicates that [the manufacturer] was indifferent to the possibility that [the dry-cleaning company]

28

would pour PCE down the drain" and that "[t]his is insufficient." *Id*. at 909. The dry-cleaning company *chose* to dispose of the PCE-laden water in the drain; that did not make the manufacturer an arranger of the disposal. *Id*.

Applying the guidance from those cases to this one, this Court concludes that the United States is not an arranger as a matter of law. The record is clear that the United States did not "take[] *intentional* steps to dispose of a hazardous substance." *Burlington N.*, 556 U.S. at 611 (emphasis supplied).

FRC seems to infer that the United States intentionally disposed of hazardous tailings because it (1) controlled F&M's mining activities, (2) encouraged F&M to construct a flotation mill, and (3) knew that F&M was dumping tailings on site.

According to FRC, the Government "instructed" F&M where to mine, demonstrating that it controlled F&M's mining activities. In 1953, F&M sought the DMEA's assistance after being unable to strike ore at the Conjecture site. Dkts. 227, ¶ 5; 259, ¶ 5. During an ensuing site visit, a government inspector suggested that F&M dig in a different direction. Dkts. 227, ¶ 5; 259, ¶ 5. F&M did not immediately follow this suggestion. *Id*. Two weeks later, F&M did change its mining course. In a subsequent memorandum, Raymond Robinson, a U.S. Geologist, wrote, "Since the time of the last inspection (February 13) the foreman

had been driving too far in the footwall of the ore-bearing structure. Recently, he was *instructed* to turn back to the main structure and the ore shoot was found on it." Dkt. 263-3 (emphasis supplied). Even assuming that it was the Government—and not someone at F&M—that instructed the foreman to change course, the instruction came after F&M's request for assistance and had nothing to do with the disposal of mine waste. It is at most "a scintilla of evidence" from which no reasonable juror could find that the United States intended F&M to dispose of hazardous waste on site. *Liberty Lobby*, 477 U.S. at 252; *see also Burlington N.*, 556 U.S. at 612.

Nor is it enough to show that the Government encouraged F&M to construct a mill.[5] Showing that the Government liked the prospect of a mill at the

---

[5] According to FRC, the Government, in reviewing F&M's mining proposal, recognized that creation of a mill could spur mining development in the area by providing neighboring, but smaller, mining properties convenient access to a mill. Dkt. 232-1, pgs. 7–8. A Field Team representative, H.T. Reno, suggested that "this possibility alone is sufficient justification for recommending the exploratory project." *Id*. FRC claims that the Government convinced F&M to build the mill. It points to Reno's memo following a June 1952 routine mine inspection:

> I had a long talk with the Operations and Mr. Taft about the operation of the mine and the work on the exploration project. They now seem to be in agreement that the mine will never be a paying producer on high grade ore alone and are planning to install a mill and continue development work in addition to carrying on the exploration project.

Conjecture site does not raise a genuine issue of material fact on the question whether the Government intended that hazardous substances be dumped on site.

Finally, mere knowledge, after the mill was operational, that F&M was discarding mill tailings on site does not make the United States an arranger. "[C]ontrol is a crucial element of the determination of whether a party is an arranger," *United States v. Shell Oil Co.*, 294 F.3d 1045, 1055 (9th Cir. 2002), and FRC has offered no evidence that the Government controlled how the tailings would be disposed. To the contrary, the DMEA contract explains that F&M had "sole direction and control" over the work it performed. Dkt. 239-1, Ex. B.

The United States is entitled to judgment as a matter of law on this counterclaim.

### B.    Operator liability

The United States has moved for summary judgment on FRC's counterclaim that the Government is liable for contribution as an "operator." Dkt. 234. CERCLA imposes liability on "any person who at the time of disposal of any

---

Dkt. 232-1, pg. 10. FRC's expert, Timothy LeCain, concludes from these contemporaneous pieces of evidence that the Government "played a significant role in leading [F&M] to construct a mill[.]" *Id*. But even LeCain concedes that it was F&M who proposed building the mill, not the Government, and that "[p]recisely how influential [the Government's] advice was to the company in reaching this decision [to build the mill] is difficult to determine." Dkt. 232-1, pgs. 4–5.

hazardous substance owned or operated any facility at which such hazardous substances were disposed of."  42 U.S.C. § 9607(a)(2).  To be liable as an operator, a party must "manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations."  *United States v. Bestfoods*, 524 U.S. 51, 66–67 (1998).  FRC has failed to raise a genuine dispute of material fact as to whether the Government managed, directed, or conducted either operations having to do with the disposal of hazardous waste or decisions about compliance with environmental regulations.

The United States relies on the DMEA contract with F&M, which provided that work at the Conjecture site was to be "performed by [F&M] under [its] sole operation and control."  Dkt. 239-1, Ex. B.  For its part, FRC says that the United States could have directed F&M to properly dispose of the tailings and, had it done so, F&M may have taken the Government's advice.  But even if the Government had such authority (the DMEA contract says otherwise), a party cannot be liable as an operator for merely "stand[ing] by and fail[ing] to prevent the contamination."  *Long Beach Unified Sch. Dist. v. Dorothy B. Godwin Cal. Living Trust*, 32 F.3d 1364, 1367 (9th Cir. 1994).

The record is clear that the Government did not "play an active role in

running the facility, typically involving hands-on, day-to-day participation in the facility's management." *Id*. at 1367. The Government kept tabs of F&M's operations, frequently visited the site, and may (viewing the evidence in the light most favorable to FRC), have instructed F&M on one occasion to mine in a different direction. This evidence does not create a genuine dispute of material fact. On this record, the Court is satisfied that no reasonable juror could conclude that the United States managed, directed, or conducted operations at the Conjecture site specifically related to the disposal of hazardous waste.

### C.    Owner liability

The United States moves for summary judgment on FRC's counterclaim seeking contribution from the United States as an "owner." Dkt. 234. CERCLA imposes liability on "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2).

FRC did not oppose the United States' argument that it cannot be held liable as an owner of the Conjecture and Minnie Moore sites. The Court agrees that the United States is not an owner for CERCLA purposes, regardless of whether the sites are subject to patented or unpatented mining claims. A patented mining claim vests ownership in the private party who patented the claim. *See Kunkes v. United*

*States*, 78 F.3d 1549, 1551 (Fed. Cir. 1996) (explaining that a private owner who obtains a patent, which is an official document issued by the United States attesting that fee title to the land is in the private owner, holds fee title to the land).  And even if the mining sites were subject to unpatented mining claims, the United States still would not be an owner under CERCLA.  *See ASARCO*, 280 F. Supp. 2d at 1133–34 ("[T]he United States' interest in lands subject to unpatented mining claims does not make it an 'owner' of such mining claims under CERCLA.");  *United States v. Friedland*, 152 F. Supp. 2d 1234, 1244–46 (D. Colo. 2001) ("Because unpatented mining claimants possess vested property rights (including the right to sell, mortgage, or inherit), are subject to taxation, and cannot be divested of their rights if they demonstrate substantial compliance with maintenance requirements specified in the mining law, I find that the United States is not an "owner" in the fullest sense of the term.").  The Court finds no genuine issues of material fact in dispute and that judgment in the United States' favor is proper as a matter of law.

## V.     FRC's liability at the Minnie Moore site (Dkt. 214)

The United States has moved for summary judgment on its CERCLA claim against FRC for its cleanup of the Minnie Moore site located near Sun Valley, Idaho.  Dkt. 214.  In its opposition and at oral argument, FRC conceded liability

for $689,223.24 in cleanup costs and $9,208.68 in accrued interest, but contested

the Government's efforts to collect attorneys' fees and other enforcement costs.

Dkt. 224. Summary judgment is therefore appropriate in favor of the United States

and the Court shall award cleanup costs ($689,223.24) and accrued interest

($9,208.68).

## VI.  The United States' motion to bifurcate enforcement costs issues (Dkt. 207)

The United States has moved to bifurcate issues relating to the amount of

enforcement costs (e.g., attorneys' fees) incurred by the DOJ in pursuing recovery

against FRC. Dkt. 207. The United States urges the Court to first decide liability

before addressing enforcement costs. Because the Court finds FRC liable under

CERCLA at both the Minnie Moore and Conjecture sites, the only remaining issue

is whether and what amount the United States can recover in enforcement costs.

The motion to bifurcate is therefore moot.

FRC has moved separately for summary judgment claiming that the United

States' method for tracking enforcement costs is inconsistent with the NCP. Dkt.

225. CERCLA allows the Government to recoup "all costs of removal or remedial

action incurred by [it] not inconsistent with the [NCP]." 42 U.S.C. §

9607(a)(4)(A). This includes reasonable attorneys' fees. *Chapman*, 146 F.3d at

1175. However, under the NCP, the lead agency is required to "complete and

maintain documentation to support all actions taken under the NCP and to form the basis for cost recovery" and "documentation shall be sufficient to provide . . . the response action taken [and] accurate accounting of federal, state, or private party costs incurred for response actions." 40 C.F.R. § 300.160(a)(1).

The United States had originally alleged CERCLA violations against FRC in connection with three mines: Conjecture, Minnie Moore, and Idaho Lakeview. The Department of Justice used a single matter number to track its time and costs spent on pursuing its claims related to the three mines. The DOJ's billing entries did not include written descriptions of the work performed, making it difficult to attribute time spent to particular tasks. This became an issue roughly two years into litigation when the DOJ elected to withdraw its claims relating to the Idaho Lakeview site. FRC contends that the United States cannot, consistent with the NCP, accurately parse out the time spent on issues related to the remaining two mines.

The United States provided a declaration by DOJ attorney Paul Gormley in which he attempts to establish a reasonable approximation of the time spent on the Minnie Moore and Conjecture sites. Dkt. 259-5.[6] The Court is satisfied, based on

---

[6] FRC moved to strike paragraphs 5 through 12 and 14, including subparagraphs, of Mr. Gormley's declaration. Dkt. 260. According to FRC, those paragraphs "are not statements of fact supported by evidence, but mere statements

Mr. Gormley's declaration, that there is a genuine issue of material fact as to

whether the DOJ will be able to accurately identify at least *some* time spent on the

Minnie Moore and Conjecture sites. Even if the DOJ cannot accurately

substantiate its billing *before* withdrawing its Idaho Lakeview claims, it likely can

for its subsequent billing. Moreover, the United States represented at oral

argument that it now includes written descriptions of its tasks, indicating again that

it may be able to establish accurate billing records for some of the enforcement

costs it seeks. Based on this record, FRC's motion for summary judgment seeking

to preclude recovery of all DOJ enforcement costs must be denied.

## VII. The United States' fraudulent transfer and veil-piercing claims (Dkt. 240)

The United States moves for summary judgment on one of its claims under

---

of belief and opinion which contradict the United States' expert testimony in
violation of Fed. R. Civ. P. 56(c)(4); FRE 701." *Id*. Federal Rule of Civil
Procedure 56(c)(4) provides that "[a]n affidavit or declaration used to support or
oppose a motion must be made on personal knowledge, set out facts that would be
admissible in evidence, and show that the affiant or declarant is competent to
testify on the matters stated." These factors are satisfied: Mr. Gormley's
declaration is based on personal knowledge of his own billing history and records.
FRC's real argument is that Mr. Gormley is simply guessing about the prior work
he performed on this case. But that is an attack of the weight to be accorded
Mr. Gormley's statements, not their admissibility. In the same motion, FRC seeks
to strike certain paragraphs in a declaration submitted by Robert Wintergerst, Dkts.
237; 239-2. The Court did not rely on any of the challenged portions of
Wintergerst's declaration in its decision. FRC's motion to strike, Dkt. 260, is
therefore DENIED.

the Federal Debt Collection Procedures Act (FDCPA), 28 U.S.C. § 3304(a)(2), and its veil-piercing claims.  Dkt. 240.[7]

## A.    FDCPA claim

The United States alleges that Blum fraudulently transferred a corporate asset, mining property in Colorado called CBCI, from FRC to the Blum Trust.  A transfer "is fraudulent as to a debt to the United States which arises before the transfer is made or the obligation is incurred under the FDCPA" when:

> (2)(A) the transfer was made to an insider for an antecedent debt, the debtor was insolvent at the time; and
>
> (B) the insider had reasonable cause to believe that the debtor was insolvent.

28 U.S.C. § 3304(a)(2).

Blum, the Blum Trust, and CBCI (the Blum Defendants) do not contest that these elements are satisfied.  They concede, for example, that "Blum is an insider," Dkt. 267, pg. 6, that "FRC was insolvent" when CBCI was transferred, Dkts. 241, ¶ 42; 268, ¶ 42, that Blum and the Blum Trust "were aware of FRC's financial

---

[7]  The United States moved to file the briefing on its motion under seal. Dkts. 242, 280.  During oral argument, counsel for Blum and Blum Trust did not contend that the documents subject to the United States' two motions to seal required sealing.  Moreover, neither Blum nor the Blum Trust moved to seal their own briefing in opposition to the United States' summary judgment motion. Accordingly, as the Court orally ruled at the May 5, 2014, hearing, the United States' motions to seal, Dkts. 242, 280, are DENIED.

condition" when CBCI was transferred, Dkts. 241, ¶ 44; 268, ¶ 44, and that the transfer "reallocated debt between FRC and the [Blum Trust]," Dkts. 241, ¶ 27; 268, ¶ 27.

The Blum Defendants rely on two affirmative defenses. First, they argue that Blum transferred CBCI from FRC to the Blum Trust in the ordinary course of business. *See* 28 U.S.C. § 3307(f)(2) ("A transfer is not voidable under section 3304(a)(2) . . . if made in the ordinary course of business or financial affairs of the debtor and the insider[.]"). Second, they contend that Blum transferred CBCI with the intent to rehabilitate FRC. *See* 28 U.S.C. § 3307(f)(3) ("A transfer is not voidable under section 3304(a)(2) . . . if made pursuant to a good-faith effort to rehabilitate the debtor and the transfer secured both present value given for that purpose and an antecedent debt of the debtor."). The Blum Defendants bear the burden of proof on their affirmative defenses. *See Clark v. Capital Credit & Collection Servs., Inc.*, 460 F.3d 1162, 1177 (9th Cir. 2006).

### 1. The "ordinary course" affirmative defense

The Ninth Circuit has not addressed the "ordinary course of business" defense under the FDCPA, but it has discussed a similar provision in the Bankruptcy Code. Under 11 U.S.C. § 547(c)(2)(B), a trustee may not avoid a transfer made in the "ordinary course of business or financial affairs of the debtor

and the transferee." To rely on this defense, the favored creditor "must show a baseline of past practices between itself and the debtor" and "that the relevant payments were ordinary in relation to [these] past practices." *In re Healthcentral.com*, 504 F.3d 775, 790 (9th Cir. 2007) (citation and internal quotations omitted). Importantly, "the purpose of this [defense] is to leave undisturbed normal financial relations because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." *Id*. at 789. The Court sees no reason why similar requirements and policy justifications should not apply to the FDCPA's "ordinary course of business" defense.

The Blum Defendants have provided no evidence of any past business interactions directly between FRC, the debtor, and Blum Trust, the insider and transferee. They offered a declaration from Mr. Blum, who explained that "FRC had a history of receiving payments and transferring payments to other entities," and that the transfer agreement between FRC and the Blum Trust "did not differ from past practices of funding FRC and CBCI." Dkt. 267-1, ¶ 14. But these statements reveal no past practices between FRC and the Blum Trust or even Blum directly.

Even assuming the existence of past practices, the Blum Defendants have

failed to raise an issue of fact that the FRC transfer was ordinary in relation to those practices. *See In re Healthcentral.com*, 504 F.3d at 790. According to Scott Butters, FRC's President, CBCI was FRC's "only asset of any possible value." Dkt. 241-7. He explained that from 1990 through October 2010, FRC had no revenue. *Id*. And despite allegedly having tried to sell CBCI for 30 years to third-parties, FRC finally sold its only asset of value to Blum Trust, an insider, just two months afer receiving a financial inquiry from the United States relating to FRC's ability to satisfy any potential CERCLA liability. Dkts. 241, ¶ 26; 268, ¶ 26. FRC's transfer was anything but ordinary.

### 2. The "good faith rehabilitation" affirmative defense

The Blum Defendants say that the CBCI transfer was intended to rehabilitate FRC by "lower[ing] the amount of debt it was carrying on its books." As Blum explains, the transfer agreement "reallocated debt among FRC and the [Blum Trust]." Dkt. 267-1, ¶ 14.

First, the Court is not convinced that a reasonable jury could conclude that transferring FRC's sole asset of value was a good-faith effort to rehabilitate FRC. Second, reducing and reallocating FRC's debt does not satisfy the elements of the "good-faith rehabilitation" defense under 28 U.S.C. § 3307(f)(3). That section provides that "[a] transfer is not voidable under section 3304(a)(2) . . . if made

41

pursuant to a good-faith effort to rehabilitate the debtor and the transfer secured

*both* present value given for that purpose and an antecedent debt of the debtor." 28

U.S.C. § 3307(f)(3) (emphasis supplied). The Blum Defendants have provided no

evidence that the CBCI transfer *secured*, as opposed to merely paid down or

reallocated, antecedent debt.

### B. Veil-piercing claims

The United States seeks an order piercing FRC's and CBCI's corporate veils

to allow recovery against CBCI and Blum directly for FRC's debts. Under Idaho

law,[8] the corporate veil may be pierced when (1) "there is such a unity of interest

and ownership that the individuality of such corporation and such person has

ceased" and (2) it "appear[s] from the facts that the observance of the fiction of

separate existence would, under the circumstances, sanction a fraud or promote

injustice." *Swenson v. Bushman Inv. Props., Ltd.*, 870 F. Supp. 2d 1049, 1058

(D. Idaho 2012) (quoting *Maroun v. Wyreless Sys., Inc.*, 114 P.3d 974, 986–87

(Idaho 2005)).

The defendants do not dispute the first prong of the veil-piercing inquiry.

Blum controls FRC and CBCI, Dkts. 241, ¶ 47; 267, ¶ 47, and the entities fail to

observe a host of corporate formalities. For example, neither FRC nor CBCI staff

---

[8] The Court applies the law of the forum state to alter ego claims. *S.E.C. v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003).

the number of directors required by their Articles of Incorporation; neither have

been able to produce any shareholder meeting minutes or corporate record books;

and neither has filed federal income tax returns since 2000. Dkts. 241, ¶¶ 49–51;

267, ¶¶ 49–51. Moreover, both FRC and CBCI—which are Blum-controlled

entities—fund their activities through a common bank account. Dkts. 241,

¶¶ 16–17; 267, ¶¶ 16–17.

The defendants insist that a factual dispute exists about whether "the

observance of the fiction of separate existence would, under the circumstances,

sanction a fraud or promote injustice." *Swenson*, 870 F. Supp. 2d at 1058. Blum

has personally guaranteed any judgment in favor of the United States up to $5.9

million. According to the defendants, the United States cannot show that injustice

will result absent piercing the corporate veil because it cannot show that it will

recover more than the guaranteed $5.9 million.

The Court is satisfied that there is no genuine issue of material fact in

dispute that failing to pierce the corporate veil would promote injustice. The

uncontroverted evidence demonstrates Blum's "propensity to use the corporate

form as a shield from liability." *E.E.O.C. v. Burrito Shoppe, LLC*, No. CV-05-329-

S-LMB, 2008 WL 2397678, at *4 (D. Idaho June 10, 2008). Blum himself

concedes that FRC and CBCI shared a common bank account, FBO Aztec, "to

frustrate attempts by certain banks to attach assets of FRC and CBCI." Dkt. 267-1, ¶ 5 (emphasis in original). And this Court has already found that FRC fraudulently transferred CBCI to the Blum Trust. The existence of Blum's unsecured, personal guaranty does not create a genuine issue of material fact regarding the need for veil piercing, cognizable under Idaho and federal law, when the United States is a putative judgment creditor in a CERCLA recovery action which legitimately inquired whether FRC could satisfy its obligations, triggering the fraudulent transfer.

## CONCLUSION

For the reasons stated above:

1.     The United States' Motion for Partial Summary Judgment Regarding the Conjecture Mine Site, Dkt. 235, is GRANTED. FRC is jointly and severally liable to the United States for $3,653,362.52 in cleanup costs and $54,546.22 in accrued interest. FRC is also jointly and severally liable to the United States for all additional costs of removal or remedial action incurred by the United States after January 31, 2013, that are not inconsistent with the NCP. *See* 42 U.S.C. §§ 9607(a)(4)(A); 9613(g)(2).

2.     FRC's Motion for Partial Summary Judgment, Dkt. 225, is DENIED.

3.     The United States' Motion for Summary Judgment on the Counterclaim,

Dkt. 234, is GRANTED.

4.      The United States' Motion for Summary Judgment Regarding the Minnie
        Moore Site, Dkt. 214, is GRANTED.  FRC is jointly and severally liable to
        the United States for $689,223.24 in cleanup costs and $9,208.68 in accrued
        interest.  FRC is also jointly and severally liable to the United States for all
        additional costs of removal or remedial action incurred by the United States
        after January 31, 2013, that are not inconsistent with the NCP.  *See* 42
        U.S.C. §§ 9607(a)(4)(A); 9613(g)(2).

5.      The United States' Motion to Allow Issue of Attorney Costs to be Tried
        Separately, Dkt. 207, is DENIED as moot.

6.      The United States' Motion for Summary Judgment on the United States'
        Claims Under Section 3304(A)(2) of the FDCPA; and re: Veil Piercing, Dkt.
        240, is GRANTED.

7.      The United States' Motions to File Under Seal, Dkts. 242 and 280, are
        DENIED.

8.      FRC's Motion to Strike, Dkt. 260, is DENIED.

        The parties shall confer regarding the need for further discovery on
determining the amount of the Government's enforcement costs.  A stipulated
proposed timetable shall be presented to the Court.  The Court will then determine

whether it is necessary to convene a status conference to manage whatever remains of this litigation.

**IT IS SO ORDERED**.

Dated this 14th day of July, 2014.


Richard C. Tallman
United States Circuit Judge